# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON<br><br>                Respondent,<br><br>. v.<br><br>IBRAHIM OBAI KAMARA,<br><br>                Appellant. | No. 77428-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: January 28, 2019 |

ANDRUS, J. — A jury found Ibrahim Kamara guilty of gross misdemeanor harassment. He challenges the sufficiency of evidence supporting his conviction. We affirm.

## FACTS

On June 7, 2017, Lara Ramey left work and walked to a downtown Seattle bus stop to commute home. Ramey saw two men whom she assumed to be homeless. She first noticed a man seated on one of the two benches at the bus stop and noticed a second man, Ibrahim Kamara, just north of the bus stop. Kamara was performing what Ramey believed to be a slow form of martial arts. Ramey sat down on the unoccupied bench.

Kamara then sat down on the bench close enough to Ramey that their thighs were touching, and said something akin to: "I still got it" or "I still look good." 7 Verbatim Report of Proceedings (RP) at 660-61. Ramey responded, "You mean your forms?" 7 RP at

663. Kamara then asked Ramey if she took self-defense classes. She answered in the affirmative.

Kamara and Ramey, who had never met, then engaged in conversation. Early in the conversation, Kamara told Ramey that he had recently gotten out of jail. He then leaned backward, lowered his voice, and asked Ramey if she would do him a favor. Assuming that Kamara was about to ask for money,[1] Ramey preemptively said: "[S]orry I don't have any cash." 7 RP at 667. Ramey's assumption seemed to offend and anger Kamara. Kamara responded that he did not need her money. He then leaned toward Ramey and said: "I want to take you behind the Federal Building and fuck the shit out of you." 7 RP at 668.

Ramey turned away and stood up to leave. Kamara also stood up, turned, and blocked Ramey by standing in front of her. Kamara then told Ramey that if she left he would "mess [her] up" or "fuck [her] up right there." 7 RP at 670; 8 RP at 728. He then smirked and flexed his muscles. Ramey then sat back down.

Kamara also sat back down and kept telling Ramey, "You know I can do it." 7 RP at 671. She interpreted Kamara's statements to mean that he would beat her up or sexually assault her if she tried to leave. Kamara was bigger than Ramey. Ramey believed that hitting Kamara "wouldn't do anything." 7 RP at 676. She felt "stuck in this [bus shelter] with [Kamara] who thought he could do what he wanted." 7 RP at 676.

During this time, a bus had come and gone by the stop and another woman walked by and boarded that bus. Ramey did not call out for help or attempt to get on the first

---

[1] Ramey assumed Kamara was homeless and about to ask her for money because he smelled of alcohol and excessive body odor. Kamara had also earlier mentioned that he was trying to catch a bus to Lynnwood.

bus. Ramey testified that she was frightened of what might happen if she sought help and did not believe the other woman who boarded the bus would be able to help if Kamara physically attacked her. She did not attempt to board the bus because Kamara was sitting next to her and she was afraid of how he might react. Ramey was also unable to get the attention of the man sitting on the other bench, and the other man did not make any attempt to intervene.

Meanwhile, Kamara kept getting up and down from the bench and walking within five feet of her saying: "I'm nice." 7 RP at 677-78. Ramey did not feel she could escape. At a certain point, Kamara gave Ramey his phone so that Ramey could enter her name and number into his contacts. Once Ramey had Kamara's phone, she placed a call to her own mobile phone[2]—instead of calling 911—because:

> I had [Kamara's] phone in my hand . . . And at that time, I was like, okay . . . I can call 9-1-1 or I can call my husband or I can do something with this phone. And I decided not to call 9-1-1 because by the time they got there, you know, and he registered that I had called 9-1-1, anything could happen . . . So I decided . . . that if anything were to happen, I need something that's going to trace something back to this guy.

7 RP at 680-81. Once Kamara recognized that Ramey had made a call on his phone, he demanded to know if she had given her real number.

Kamara then reached out and ran his finger down the side of Ramey's face to remove a piece of hair that had blown into Ramey's mouth. She turned away when he touched her. Kamara then pulled Ramey's chin towards him and again asked if she had given him a fake phone number. While Ramey did not believe Kamara was trying to

---

[2] Ramey did not have her mobile phone with her at that point because she had accidentally left it in her vehicle that morning.

physically hurt her by touching her face and chin, she thought it was part of his ongoing attempts to manipulate her

Kamara continued getting up and down from the bench to smoke. During one of the times Kamara was away from the bench, Ramey got the attention of the man seated on the other bench. When the other man's bus came, Ramey boarded the bus as well.[3] Kamara did not try to prevent Ramey from boarding the bus. The entire encounter between Kamara and Ramey lasted approximately 15 minutes.

After boarding the second bus, she exited this bus a few blocks later in order to catch her normal bus at a different stop. As she waited for a bus at this location, Ramey saw an acquaintance. This acquaintance testified that he saw Ramey shaking with fear and almost on the verge of tears. Ramey told the acquaintance that she had almost been mugged.

After arriving home, Ramey informed her spouse about the encounter with Kamara and then contacted law enforcement. A King County Sheriff detective identified Kamara as a suspect by running his phone number—obtained from Ramey's phone—through one of its databases. Ramey later identified Kamara from a photographic lineup. When Ramey identified Kamara in the lineup, the detective noticed that her "voice wavered and cracked" and "her lips were trembling or quivering." 7 RP at 552. Subsequently, law enforcement arrested Kamara and discovered that his phone had registered an outgoing call to Ramey's phone on June 7, 2017.

---

[3] The bus Ramey boarded was not one that she normally took and it was not one that would have taken her home.

The State charged Kamara with unlawful imprisonment, assault in the fourth degree, and gross misdemeanor harassment. It also alleged that Kamara committed each of these offenses with sexual motivation.

Kamara testified at trial in his own defense. He admitted sitting next to Ramey after his stretches, engaging her in conversation, and asking for her phone number. However, he denied threatening Ramey, saying that he wanted to "fuck the shit out of" her, preventing her from leaving the bus stop, or making any physical contact with her.

Without objection, the trial court instructed the jury regarding the harassment allegation, in relevant part as follows:

> To convict the defendant of the crime of Harassment, as charged in Count III, each of the following four elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about June 7, 2017, the defendant knowingly threatened:
>
>> (a) to cause bodily injury immediately or in the future to Lara Ramey; or,
>>
>> (b) to subject Lara Ramey to physical confinement or restraint;
>
> (2) That the words or conduct of the defendant placed Lara Ramey in reasonable fear that the threat would be carried out;
>
> (3) That the defendant acted without lawful authority; and
>
> (4) That the threat was made or received in the State of Washington.
>
> If you find from the evidence that elements (2), (3) and (4) and any of the alternative elements (1)(a), or (1)(b), have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to Count III. To return a verdict of guilty, the jury need not be unanimous as to which of alternatives (1)(a) or (1)(b) has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt.

Kamara did not request and the trial court did not give an instruction requiring jury unanimity as to whether Kamara committed the harassment under the threat of bodily

injury prong or the physical restraint prong. In closing, the prosecutor argued that evidence supported both prongs.

The jury acquitted Kamara of unlawful imprisonment and of assault in the fourth degree, but found him guilty of gross misdemeanor harassment. It did not find that Kamara committed harassment with sexual motivation. Kamara appeals.

ANALYSIS

Kamara argues insufficient evidence supports his conviction for harassment. Specifically, Kamara claims the State failed to prove he knowingly threatened to subject Ramey "to physical confinement or restraint that placed her in reasonable fear that the threat would be carried out." He contends this lack of evidence requires a reversal of his conviction because the jury instruction did not require jury unanimity on the alternative means of committing harassment, threat to commit bodily harm. We disagree.

Due process requires the State to prove every element of the charged crimes beyond a reasonable doubt. State v. Kalebaugh, 183 Wn.2d 578, 584, 355 P.3d 253 (2015). "'To convict a person of a criminal charge, the jury must be unanimous that the defendant committed the criminal act.'" State v. Bobenhouse, 166 Wn.2d 881, 892, 214 P.3d 907 (2009) (quoting State v. Camarillo, 115 Wn.2d 60, 63, 794 P.2d 850 (1990)). However, when the crime can be committed by alternative means, unanimity is required "only when a general verdict raises due process concerns, i.e., when one or more alternatives presented to the jury are not supported by sufficient evidence." State v. Woodlyn, 188 Wn.2d 157, 162, 392 P.3d 1062 (2017). If there is sufficient evidence to support each alternative means submitted to the jury, the conviction will be affirmed

because we infer that the jury rested its decision on a unanimous finding as to the means. State v. Randhawa, 133 Wn.2d 67, 73-74, 941 P.2d 661 (1997).

In reviewing sufficiency of evidence claims, we view the evidence in the light most favorable to the State and test for whether any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences a trier of fact can draw from that evidence. Salinas, 119 Wn.2d at 201. Circumstantial evidence and direct evidence are equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer "to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

To convict a defendant of misdemeanor harassment, the State must prove beyond a reasonable doubt the defendant, without lawful authority, knowingly (1) threatened to cause bodily injury immediately or in the future to the person threatened, or (2) threatened to subject the person threatened to physical confinement or restraint.[4] RCW 9A.46.020(1)(a). Furthermore, the State must prove the defendant, by words or conduct, placed the person threatened in reasonable fear that the threat will be carried out. RCW 9A.46.020(1)(a), (b).

A threat is a direct or indirect communication of the intent to do the act threatened. RCW 9A.04.110(28). To constitute harassment—and to avoid infringing upon any free

---

[4] The harassment statutes provide four alternative ways to commit the offense; however, only two of the alternatives are relevant here. See RCW 9A.46.020(1)(a)(i)-(iv). The offense of harassment is, generally, a gross misdemeanor but is a felony if the defendant threatens to "kill the person threatened." RCW 9A.46.020(2)(b).

- 7 -

speech rights protected under the First Amendment—the threat must be a "true threat." State v. Kilburn, 151 Wn.2d 36, 41, 84 P.3d 1215 (2004). A "true threat" is "a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person." Kilburn, 151 Wn.2d at 43 (internal quotations and citations omitted). Additionally, "the nature of a threat depends on all the facts and circumstances, . . . [not] a literal translation of the words spoken." State v. C.G., 150 Wn.2d 604, 611, 80 P.3d 594 (2003).

Kamara does not challenge the sufficiency of the evidence that he harassed Ramey by knowingly threatening to cause her bodily injury. Kamara threatened to "mess" or "fuck" Ramey up. Kamara also concedes that he made "Ramey afraid." App.'s Br. at 17. There is sufficient evidence to establish that Kamara harassed Ramey by means of threatening her with bodily injury.

Kamara argues the State failed to present sufficient evidence he knowingly threatened to subject Ramey to physical confinement or restraint. Further, he contends Ramey's "perception that her movement was restricted was unreasonable, and was based on racial fear and mistaking [his] social status as a threat." App.'s Br. at 17.

Knowingly Threaten Physical Confinement of Restraint

The jury had ample evidence from which to find Kamara knowingly threatened physical confinement or restraint. Kamara sat uncomfortably close to Ramey at the bus stop. Kamara told Ramey that he wanted to "fuck the shit out" of her. When Ramey got up to leave the bus stop, Kamara blocked her path, flexed his muscles and said he would "mess" or "fuck her up" if she left. Kamara remained within five feet of Ramey, telling her:

"I'm nice" and "You know I can do it." A reasonable jury could conclude that Karama intentionally threatened to restrain Ramey by standing in front of her, blocking her path, and verbally threatening to assault her if she left.

Reasonableness of Ramey's Fear

At trial, Kamara argued that his case is "a lot about bias" and "a lot about institutional racism" because he is black and Ramey is white. 8 RP at 862. He claimed that Ramey's fear of physical confinement or restraint was not objectively reasonable because she was "suspicious of him from the moment she saw him. And at that point, she knew nothing abut [sic] the content of his character. She's just looking at the color of his skin." 8 RP at 867. Kamara told the jury that Ramey "was scared because there was a big black guy talking to her[,]" and that "[s]he was afraid of a black man who . . . reminded her of brown leather." 8 RP at 870, 872-73. There is sufficient evidence from which we conclude the jury rejected this argument.

To show reasonable fear, the State must show that Kamara's words and actions caused Ramey to subjectively and objectively fear that his threat would be carried out. State v. Cross, 156 Wn. App. 568, 582, 234 P.3d 288 (2010), remanded on other grounds, 172 Wn.2d 1009 (2011). Ramey testified that Kamara was physically bigger than she and that she felt trapped and frightened to the point that she used Kamara's phone to dial her own in order to leave something tracing back to Kamara if something happened to her. When the chance came to flee safely, Ramey boarded a bus that she did not normally take in order to get away from Kamara. Witnesses testified when they saw Ramey after the incident, she was shaking with fear and appeared on the verge of tears. When Ramey was asked to identify her assailant in a photomontage, she became visibly

distressed when she saw Kamara's picture. This evidence supports the jury's conclusion that Kamara's words and conduct caused Ramey to subjectively fear he would confine or restrain her from leaving the bus stop.

Moreover, Kamara's words, combined with his act of standing and flexing his muscles in front of Ramey—irrespective of his race—support an objective fear of confinement or restraint. "A true threat is a serious threat, not one said in jest, idle talk, or political argument." Kilburn, 151 Wn.2d at 43. Under the circumstances presented, Kamara's statements and conduct cannot be described as "jest, idle talk, or political argument." The evidence supports a finding that Ramey's fear was objectively reasonable.

Because the State presented sufficient evidence of both alternative means by which Kamara committed harassment, there was no need for a unanimity instruction. The absence of a unanimity instruction on the alternative means was not error. Therefore, we affirm Kamara's conviction.

Affirmed.

_Andrus, J._

WE CONCUR:

_____  _Schindler, J._

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2019 JAN 28 AM 8:39